UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

RICKEY LEE CHRISTMAS,

     Plaintiff,

v.                                     Case No: 8:17-cv-1183-KKM-SPF

LUIS RODRIGUEZ-COLON and
MARGIE GOMEZ,

     Defendants.

_____

## ORDER

Under current Supreme Court precedent, an inmate may bring an Eighth Amendment claim if he has experienced inadequate medical treatment that rises to the level of deliberate indifference. The plaintiff here, Rickey Christmas, brought such a claim arising from his time at the Polk County Jail. Prior to his detention there, Christmas sustained a close-range gunshot wound to his abdomen and underwent surgery resulting in a colostomy, inclusion of mesh to hold his abdomen together, and, eventually, hernias. Christmas claimed that—over the relevant span of roughly eighteen months at the Polk County Jail—he informed medical providers of his excruciating pain due to the deteriorating condition of the colostomy, the abdominal mesh, and the hernias, yet received little to no treatment other than sporadic Tylenol prescriptions. Christmas survived

summary judgment and presented his case to a jury, who found in his favor. The Defendants, two of the physicians at Polk County Jail, now ask the Court to enter judgment as a matter of law in their favor or, alternatively, to disturb the decision of the jury and grant them a new trial. Because Christmas's evidence was sufficient for a reasonable jury to find in his favor, Defendants are not entitled to their first requested relief. Similarly, the Court declines to displace the jury's verdict and grant a new trial where there is no manifest injustice to be cured.

## I.   PROCEDURAL HISTORY

This case involves a protracted procedural history, albeit one that is not abnormal in prisoner litigation. Christmas filed a complaint pro se on May 18, 2017. (Doc. 1.) The complaint was dismissed for failure to state a claim, (Doc. 9), and Christmas filed the Amended Complaint on August 31, 2017. (Doc. 10.) Christmas initially filed claims against Drs. Rodriguez and Gomez, Mr. Gonzalez (a licensed mental health counselor), and Corizon Health Inc., the contractor responsible for providing medical services at the Polk County Jail. (Doc. 10.) On June 27, 2018, the Court granted Defendants' motion to dismiss as to Mr. Gonzalez but denied the motion as to the remaining defendants. (Doc. 45.)

The parties engaged in discovery until January 2019, when Defendants filed their first motion for summary judgment. (Doc. 65.) The Court denied the motion without

prejudice because Defendants failed to address the allegations in Christmas's Amended Complaint, namely the medical care Christmas received from December 2016 to August 2017—part of the crucial time period in this case. (Doc. 98.)

Defendants filed an Amended Motion for Summary Judgment on October 11, 2019. (Doc. 105.) The Court granted in part and denied in part the motion on June 17, 2020. (Doc. 116.) Specifically, the Court granted the motion with regards to the claims against Corizon as to Christmas's claims that Corizon had a policy of denying prisoners surgery in other than "life-threatening" circumstances or for budgetary reasons because Christmas presented evidence only of statements of individual employees and not an official policy attributable to Corizon. (Doc. 116 at 11–14.) The Court also granted summary judgment as to the claims against Drs. Rodriguez and Gomez after November 5, 2017, because the evidence showed that Christmas received an x-ray to assess his abdomen on November 6, 2017, and a referral to an outside specialist, thereby precluding a deliberate indifference claim based on inadequate treatment from that date going forward. (*Id.* at 14.) The case continued as to the claims against Drs. Rodriguez and Gomez for their conduct between December 1, 2016, and November 5, 2017. (*Id.*)[1]

The Court appointed counsel for Christmas on June 19, 2020, and shortly thereafter, the Court granted Christmas's motion to reopen discovery, permitting

---

[1] Notably, Defendants' Amended Motion for Summary Judgment contained only *two* paragraphs of argument on behalf of Drs. Rodriguez and Gomez regarding the claims against them. (Doc. 105 at 9–10.)

Christmas's newly appointed counsel to conduct additional discovery until December 18, 2020. (Docs. 117 & 129.) Neither party filed a motion for summary judgment (or any other dispositive motion) following the close of this second discovery period. Instead, in February 2021, after the case was transferred to the undersigned, Christmas requested a status conference because the case lacked a Case Management and Scheduling Order governing pretrial and trial deadlines. (Doc. 135; *id.* at 4 (explaining that "Plaintiff is ready to set this action for trial as soon as the Court's schedule permits").)

At a status conference on March 3, 2021, Christmas informed the Court that he was ready to proceed to trial. Defendants indicated that they were planning on filing another dispositive motion, even though the dispositive motion deadline passed on October 11, 2019, and they had not sought leave to file a belated one. The Court issued a scheduling order that same day setting the case for trial on April 20, 2021, and warned Defendants that a motion for judgment on the pleadings (the dispositive motion counsel indicated he wanted to pursue) would likely be denied as untimely. (Doc. 140.) A week later, Defendants filed a motion to remove the case from the April 2021 trial calendar, citing general concerns over the COVID-19 pandemic, which the Court denied without prejudice. (Doc. 146.) Notably, at the status conference when the Court inquired about potential trial dates, Defense counsel never voiced any hesitation about proceeding to trial

due to COVID-19 and instead listed potential other trial conflicts in the upcoming months.

On March 18, 2021, approximately one month before the trial, Defendants filed a motion for judgment on the pleadings with voluminous evidence attached as support. (Doc. 159.) The Court denied the motion as untimely, given that it constituted a third motion for summary judgment and would not ripen until after the beginning of trial. (Doc. 164); *see* Fed. R. Civ. P. 12(c) ("After the pleadings are closed—*but early enough not to delay trial*—a party may move for judgment on the pleadings." (emphasis added)); Fed. R. Civ. P. 12(d) (requiring conversion to a summary judgment motion when "matters outside the pleadings are presented to and not excluded by the court").

Per Local Rule 3.06, the parties conferred and filed a joint pretrial statement on April 2, 2021. (Doc. 173.) Both parties attended a pretrial conference on April 13, 2021. (Doc. 189.) At the pretrial conference, Christmas moved to amend the pleadings, with the consent of the Defendants, to pursue the claims against Defendants in their individual capacities instead of their official capacities, and the Court granted the motion. (Docs. 206 & 207.) As already evidenced by the pretrial statement, Christmas's trial brief filed on April 6, 2021, (Doc. 178), and counsel's representations at the pretrial conference, Christmas intended to pursue supervisory liability against Dr. Gomez and would move to amend the

pleadings to reflect that theory of liability if the Court concluded it was inadequately alleged in the pro se–filed Amended Complaint.

Trial began on April 20, 2021. (Doc. 200.) Christmas testified, along with Drs. Rodriguez and Gomez, and Dr. Janet Skarda, the surgeon who conducted Christmas's hernia surgery following the relevant time period at the Polk County Jail. (Doc. 200.) At the close of evidence, Christmas moved to amend his complaint to demand punitive damages under Rule 15(b)(1) and Rule 54(c). (Doc. 209.) The Court granted this motion over Defendants' objection.[2] (Doc. 210.) After the Court indicated that supervisory liability was not clearly alleged, Christmas also moved to amend the complaint to conform to the evidence of supervisory liability for Dr. Gomez pursuant to Rule 15(b)(1). (Doc. 214.) The Court also granted this motion over Defendants' objection. (Doc. 215.) Defendants then

---

[2] Specifically, the Court concluded that, if a plaintiff presented sufficient evidence of a claim of deliberate indifference, then the plaintiff inherently presented sufficient evidence to support punitive damages, which requires a showing that the defendants were recklessly or callously indifferent as compared to the greater burden of deliberately indifferent. *See, e.g.*, *Walsh v. Jeff Davis Cnty.*, 2012 WL 12952564, at *19 (S.D. Ga. 2012) ("Here, Plaintiff has presented evidence creating a genuine issue of fact regarding whether Lewis and Conaway were deliberately indifferent to Plaintiff's serious medical need. Likewise, Plaintiff has presented evidence that could support a finding of callous or reckless indifference to Plaintiff's federal protected rights."), *aff'd*, 489 F. App'x 389 (11th Cir. 2012). Further, the Court concluded that Rule 54(c), which requires a court to grant all relief to which a party is entitled, required an instruction on punitive damages even if not initially pleaded in the pro se Amended Complaint. *See* Fed. R. Civ. P. 54(c) ("Every other final judgment should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings."); *Scutieri v. Paige*, 808 F.2d 785, 790–92 (11th Cir. 1987) (concluding district court abused its discretion by not instructing jury on punitive damages where punitive damages were not specifically pleaded but the complaint adequately alleged a factual basis supporting claim for punitive damages).

moved for judgment as a matter of law under Rule 50(a), and the Court took it under advisement. (Doc. 213.)

After deliberations, the jury returned a verdict in favor of Christmas. (Doc. 217.) Specifically, the jury found that Dr. Rodriguez acted with deliberate indifference to Christmas's medical needs and awarded him $100,000 in compensatory damages and $300,000 in punitive damages. (Doc. 217.) The jury also found that Dr. Gomez intentionally committed acts that violated Christmas's constitutional right under the Fourteenth Amendment and awarded him an additional $50,000 in punitive damages. (*Id.*) Following the jury trial, the Court denied Defendants' 50(a) motion and entered judgment in favor of Christmas in accordance with the jury's verdict. (Doc. 221.) Defendants now renew their motion for judgment as a matter of law under Rule 50(b) and move for a new trial pursuant to Rule 59. (Docs. 231 & 233.)

## II.   FACTUAL BACKGROUND[3]

In January 2015, Rickey Christmas was shot at close range in the abdomen during a home invasion. (Doc. 226 at 167.) He underwent surgeries for this injury, which involved removal of parts of his intestines, insertion of a biological mesh, and a colostomy. (*Id.* at

---

[3] The Court views the facts from the trial record in the light most favorable to Christmas as the Court must when reviewing a motion for judgment as a matter of law. *See McGinnis v. Am. Home Mort. Serv., Inc.*, 817 F.3d 1241, 1254 (11th Cir. 2016). A standard for granting a new trial does not impose the same obligation on the Court; as such, the Court will note in its analysis if and when it weighs differently the evidence offered at trial. *See id.* at 1254–55.

168.) Some fragments of bullets remained even after his surgeries. (*Id.* at 173.) Following Christmas's release from the hospital, he received ongoing treatment for these injuries, and his treating physician prescribed oxycodone and Klonopin for pain and Lyrica for nerve damage in his legs. (*Id.* at 175.) During this time, Christmas sought reversal of his colostomy. (*Id.* at 170.) At his follow-up visit with the surgeon on April 13, 2016, she noted that a midline hernia had developed due to a defect in the biological mesh. (*Id.* at 177.) At trial, Christmas testified that, at this point, he understood the next step was a colostomy reversal, which he planned to have as early as May 18, 2016. (*Id.* at 185, 209.)

A week later, on April 21, 2016, Christmas was arrested and booked at Polk County Jail. (Doc. 218-1 at 1; Doc. 226 at 179–80.) Prison officials screened him for physical injuries and medical issues. (Doc. 218-1 at 2–10; Doc. 226 at 178–80.) The screening reported that Christmas had a colostomy due to a gunshot wound, bullets remaining in his abdomen, and "2 apparent hernia in abdominal area." (Doc. 218-1 at 9; Doc. 226 at 180.) Polk County Jail initially housed Christmas in the medical dorm of the South County Jail where the risk of further injury was lessened, although he eventually requested (and was granted) a transfer to have more access to recreation. (Doc. 226 at 180–81.)

Dr. Luis Rodriguez-Colon was the staff physician at the Polk County Jail, South County, employed by Corizon Health, Inc., a private company that provides medical and mental health services to prisoners and detainees at the Polk County Jail. (Doc. 173 at 6.)

8

Dr. Rodriguez was the only staff physician serving on a daily basis at the South County Jail where Christmas resided. (Doc. 226 at 239.) He supervised the nurses and nurse practitioners at that location and, even when Dr. Rodriguez was not treating patients himself, the nurses often called him to get an order for treatment. (*Id.* at 239, 247.)

Dr. Margie Gomez was the site medical director of the Polk County Jail, also employed by Corizon Health. (Doc. 227 at 52.) As site medical director, she did not attend to patients daily at the jail, but she signed off on Corizon Health policies and procedures that were implemented at the jail and had final responsibility for all treatment. (*Id.* at 52–53.) Dr. Rodriguez reported to Dr. Gomez and testified that they were in constant communication and would usually discuss non-emergent treatment with her. (Doc. 226 at 239–40.)

On May 11, 2016, less than a month after Christmas arrived at the Polk County Jail, Dr. Rodriguez saw Christmas for a medical evaluation. (Doc. 218-1 at 24; Doc. 226 at 252–53.) When reviewing Christmas's medical records, Dr. Rodriguez understood that Christmas's surgeon was considering a reversal of his colostomy at the time he was arrested. (Doc. 226 at 185 ("Mr. Rodriguez knew [Christmas had his surgery scheduled for May 18, 2016] I was there talking to him about it."); Doc. 227 at 45–46.) In the progress note, Dr. Rodriguez recorded that Christmas had a colostomy and a ventral hernia. (Doc. 218-1 at 24; Doc. 226 at 252–53.) Dr. Rodriguez testified that a ventral hernia occurs when the

abdominal wall and muscles weaken allowing abdominal content to come through it. (Doc. 226 at 253–54). Per his testimony, ventral hernias do not go away on their own. (*Id.*) And the Polk County Jail does not do surgical repairs of hernias. (*Id.*)

It is undisputed that, from April 21, 2016, until October 28, 2017, Christmas placed at least 29 health services requests reporting his significant physical ailments and desire for additional medical treatment. *See* Table 1, *infra.* During this time, Christmas suffered severe pain associated with his hernias, colostomy, and back injuries, and he informed Drs. Rodriguez and Gomez of his problems in addition to filing these requests. (Doc. 226 at 185, 190, 197, 210, 212–13, 231, 246–47.) His complaints raised in the health service requests are detailed in the Table below:

Table 1[4]

| Date | (Doc. 226) | (Doc. 218-4) | Complaint |
|------|------------|--------------|-----------|
| 4/25/16 | 182 | 423 | "Both feet hurt pretty bad and my left lower back, my thighs, and my legs, they're numb." |
| 4/27/16 | 183 | 424 | "I have bullets in my back and it's causing my legs to retain water. I need [sic] pain medication and my anxiety medication." |
| 5/2/16 | 185 | 425 | "I need my pain meds renewed. And also I need anxiety medication, I can't sleep. Having [sic] bad dreams." |
| 5/6/16 | 187 | 426 | "I have hernias and also my stomach has a bad reaction to spicey food and also creates gas. Can I be put on a spicey diet regimen. I also would want to raise the times I get my pain meds or be put back on something." |

---

[4] Christmas's written complaints are minimally altered for readability.

| 6/20/16 | 188 | 427 | "I need my pain medication renewed. I am also constipated, I need to be back on my high fiber diet." |
|---------|-----|-----|---|
| 9/24/16 | 189 | 428 | Requested more Tylenol |
| 9/30/16 | 191 | 429 | "I need my meds renewed, please, Tylenol and all the rest." |
| 12/1/16 | 191–92 | 430 | "Surgery to remove colostomy and restore intestinal tract to original configuration. Surgical removal of bullets, metal fragments near spine, gut, and repair of damaged hernia repair." |
| 12/21/16 | 194 | 1431 | "I'm still in pain, my back, and when I eat beans, I'm bleeding. The beans stop me up and hurt bad. Please help." |
| 1/11/17 | 195 | 432 | "I have a lot of bullets in my back that needs to come out and I'm in a lot of pain." |
| 1/15/17 | 196 | 433 | "My back hurts and numb and my leg burns." |
| 1/21/17 | 196 | 434 | "My back needs the bullets taken out. I need pain meds." |
| 2/14/17 | 201 | 435 | "My body aches, my head is stopped up, and I got the flu bug." |
| 2/24/17 | 201 | 436 | "I still got a cold and the back of my head hurts and my [whole] body." |
| 3/11/17 | 202 | 437 | "Bad headaches and sneezing and my back hurts." |
| 5/30/17 | 202 | 438 | "I have a sharp pain right behind my colostomy bag. I can't breathe and I'm not pooping like I was." |
| 6/10/17 | 203 | 439 | "Rolled out of bed on my back, I hurt all over." |
| 7/1/17 | 203 | 440 | "My hernia hurts and the back of my neck." |
| 7/19/17 | 204 | 441 | "My neck, my back, and my stomach hurts, constant pain." |
| 7/26/17 | 205 | 442 | "My neck and my head hurts." |
| 8/2/17 | 205 | 443 | "I'm in pain all the time. In fact, the whole time I've been here, my back where the bullets are, the back of my legs, and my stomach. I need pain meds the rest of the time I'm here until you send me to an outside doctor to get fixed." |
| 8/15/17 | 207 | 444 | "My back and my back of my leg is hurt all the way to my feet, left side." |
| 8/23/17 | 207 | 445 | "Bulging hernia, excruciating pain, remove colostomy bad and restore intestinal tract, remove metal bullets from stomach and spine, excruciating pain." |

| 9/13/17 | 209 | 471 | "I have a colostomy, but I'm pooping out my butt. I've never done this before and I've had my colostomy two years. It was supposed to be reversed a year ago." |
| 9/23/17 | 209 | 446 | "My back is numb where the bullets are and my hernia hurts. I need something for pain. I would also like to see an outside doctor. Thank you." |
| 10/9/2017 | 211 | 474 | "I have a bump in my mouth. Tell me what it is. And I'm still in pain from the bullets in my back. Can I get another out, please." |
| 10/14/17 | 211 | 475 | "My hernia mesh tore and is hurting. It's old and needs to be removed." |
| 10/18/17 | 212 | 478 | "I'm stopped up, I can't poop right for four days. The two days I passed out and went to medical. I am sour on my stomach and it's red and looks like bleeding or treating. I need to see an outside doctor before the infection spreads. No blood was drawn and my stomach is getting bigger. Send me to an outside doctor, please before I get sick and die." |
| 10/28/17 | 214 | 479 | "Stomach still hurting real bad burning on the outside is swollen, red. Please help, something is not right with this colostomy bag." |

At trial, Christmas testified that, in response to these requests for treatment, he sometimes received a three-day Tylenol prescription or a diet change to address stomach issues, but generally, he received no treatment at all. (Doc. 226 at 184, 194–95.) He also received Remeron and Effexor, antidepressants with pain relieving side-effects, prescribed by the jail psychiatrist and Dr. Rodriguez. (Doc. 226 at 248, 262–64.) If a medical provider saw him in response to his complaint, it was usually one of the nurses working under Dr. Rodriguez's supervision. By Corizon policy, after being treated by a nurse three times, a patient must be referred to a provider physician. (Doc. 226 at 241.)

Christmas testified—and Dr. Rodriguez confirmed—that he saw Dr. Rodriguez and informed him of his ongoing issues on many occasions. (Doc. 226 at 185, 190, 197, 210, 212–13, 246–47.) At trial, Christmas recalled Dr. Rodriguez telling him that the body can take quite a bit of pain. (Doc. 226 at 190.) Christmas also recalled another visit when Dr. Rodriguez told him that he was not being referred to an outside physician because there was not enough money in the budget and his condition was not life threatening. (Doc. 226 at 210.) He recalled times when, to get relief for his poorly functioning colostomy, he had to "stand in the shower with a shampoo bottle and soap and water and squeeze it in [his] bag . . . to get it broke up and moving again." (*Id.* at 182.) On one occasion in October 2017, Christmas had not had a bowel movement in two days and his colostomy was blocked up. (Doc. 226 at 212.) Despite feeling faint, he arrived at the infirmary where Dr. Rodriguez treated patients. (*Id.*) He passed out immediately upon arrival, and his bowels released green-colored excrement. (*Id.* at 212–13) Dr. Rodriguez revived him and sent him to go lie down. Christmas received no further treatment. (*Id.*) After this incident, Christmas suspected he had an infection due to his abdomen feeling as if it was burning and was swollen and red, so he placed yet another sick call but received no treatment. (*Id.* at 214.)

While Dr. Gomez did not work day-to-day in the Polk County Jail, Christmas testified that he saw her there on many occasions and complained of his pain to her directly.

13

(Doc. 226 at 231–32.) Christmas also presented evidence of six practitioner treatment orders made during the relevant time period that were ordered "per Gomez" although signed by a nurse or nurse practitioner. (Doc. 218-3 at 34–40.) In addition, Christmas presented eight prescriptions that listed Dr. Gomez as the prescriber. (*Id.* at 119, 121, 125, 131, 145, 147, 149, 151.) Finally, while Dr. Gomez maintained at trial that she never saw or evaluated Christmas, Christmas presented an affidavit executed by Dr. Gomez in which she stated: "At times Mr. Christmas has complained of pain, those complaints were addressed by providing prescription strength and over-the-counter pain medications. The latter is available to Mr. Christmas in his housing unit. . . . In my opinion, Mr. Christmas has been provided appropriate care for these conditions. If at any time I thought Mr. Christmas needed additional care or specialty consultation, I would have entered those orders." (Doc. 227 at 74–76.)

Throughout his time at the Polk County Jail, Christmas was informed that the policy was not to treat chronic pain, that is, an ongoing issue of pain. (Doc. 226 at 186, 189.) Christmas testified that, in addition to something inmates knew from personal experience, medical providers told him they did not treat chronic pain. Christmas lodged three grievances to medical or Dr. Rodriguez in this span of time asking for more treatment for the pain caused by his hernia and colostomy issues, all to no avail. (Doc. 218-12 at 2–6.) In response to one of these grievances, Christmas received a notice that read, "Upon

review of your medication file, you have been given medication on various occasions for your pain. As I am sure that my medical staff has told you before, we do not treat chronic pain." (Doc. 218-12 at 4; Doc. 226 at 218–19.) He testified that the procedure for an inmate who placed more than four sick calls in the span of 30 days was to withhold Tylenol or other treatment for two weeks or longer. (Doc. 226 at 196–97.) Christmas also learned that the jail would not pay for non-emergent surgeries. (Doc. 226 at 254; Doc. 218 at 158.) Indeed, this policy was recorded in a nursing encounter tool. (Doc. 218-1 at 31 ("[Inmate] education: Surgery and need for surgery. [Inmate] instructed that county will not pay for non-emergent surgeries."); Doc. 226 at 193.)

Christmas testified that his condition worsened from April 2016 to October 2017. By his account, the hernias were "growing every day," and he was able to observe a difference in their size. (Doc. 226 at 192–93.) By October 2017, Christmas estimated the hernias had grown at least a quarter of an inch and possibly a half an inch. (Doc. 226 at 210–11.) At this point, his stomach was swollen and burning, and the pain was excruciating all the time. (Doc. 226 at 214–21.) On November 2, 2017, Dr. Rodriguez ordered X-rays of Christmas's abdomen. (Doc. 218-2 at 101; Doc. 227 at 26–30.) Finally, on November 9, 2017, Dr. Rodriguez referred Christmas to surgery to evaluate the hernia mesh problems that he observed. (Doc. 219-2 at 781; Doc. 227 at 30–35.)

Dr. Rodriguez referred Christmas to Dr. Janet Skarda, a general surgeon at Lakeland Regional Hospital who consulted with Christmas prior to his arrest. When Christmas saw Dr. Skarda for his referral consultation in December 2017, she observed that he had a "large central abdominal hernia" and discussed surgical options for repairing his hernia and reversal of his colostomy. (Doc. 218-14 at 50–51; Doc. 228 at 34.) At their follow-up office visit in May 2018, they discussed surgical planning, and Christmas indicated that he wished to proceed with both the hernia repair and the colostomy reversal. (Doc. 218-14 at 47–48; Doc. 228 at 39–40.) Dr. Skarda preformed a colostomy reversal and hernia repair for Christmas in February 2020. (Doc. 228 at 51–52.) At a follow-up visit in March 2020, Christmas reported that he had minimal pain and was no longer using prescription medication. (Doc. 218-14 at 30–32; Doc. 228 at 56.)

When asked whether performing surgery earlier, such as December 2016, would have reduced or relieved Christmas's pain, Dr. Skarda responded "Yes, I would presume that would have happened." (Doc. 228 at 57; *id.* at 56 (responding "[y]es" to whether "his pain situation had been vastly improved as a result of the surgery").) Dr. Skarda also testified that, had the surgery occurred early, she saw no reason why it would not have been equally as successful. (*Id.*) Further, in her view, Christmas could have avoided the inconvenience and difficulties of "having to walk around with a colostomy" for "three or four years." (Doc. 228 at 57–58.)

16

## III.   LEGAL STANDARD

The question under a renewed motion for judgment as a matter of law under Rule

50(b) is whether the evidence presented is "legally sufficient . . . to find for the party on

that issue." *McGinnis v. Am. Home Mort. Serv., Inc.*, 817 F.3d 1241, 1254 (11th Cir.

2016) (quoting Fed. R. Civ. P. 50(a)(1)). "[T]he court must evaluate all the evidence,

together with any logical inferences, in the light most favorable to the non-moving party."

*Id.* (quoting *Beckwith v. City of Daytona Beach Shores*, 58 F.3d 1554, 1560 (11th Cir.

1995)). "It is the jury's task"—not the court's—"to weigh conflicting evidence and

inference, and determine the credibility of witnesses." *Shannon v. Bellsouth Telecomm.,*

*Inc.*, 292 F.3d 712, 715 (11th Cir. 2002) (quoting *Kipphardt v. Durango Steakhouse of*

*Brandon, Inc.*, 267 F.3d 1183, 1186 (11th Cir. 2001)). A court must not second-guess the

jury or substitute its judgment for that of the jury. *Id.* If reasonable jurors could reach

different results, the court may not enter judgment as a matter of law. *Id.*

"A losing party may also move for a new trial under Rule 59 on the grounds that

'the verdict is against the weight of evidence, that the damages are excessive, or that, for

other reasons, the trial was not fair . . . and may raise questions of law arising out of alleged

substantial errors in admission or rejection of evidence or instructions to the jury.'"

*McGinnis*, 817 F.3d at 1254 (quoting *Montgomery Ward & Co. v. Duncan*, 311 U.S.

243, 251 (1940)). A district court is free to weigh the evidence when considering a motion

for a new trial and may consider evidence favoring the jury verdict and evidence in favor of the moving party. *Id.* at 1255. But a motion for new trial should be granted only if the jury's verdict is "against the clear eight of the evidence" or "will result in a miscarriage of justice." *Id.* (quoting *Hewitt v. B.F. Goodrich Co.*, 732 F.2d 1554, 1556 (11th Cir. 1984)).

## IV.   JUDGMENT AS A MATTER OF LAW

Under Supreme Court precedent interpreting the constitutional right to be free from cruel and unusual punishment, a prison official's "deliberate indifference to [the] serious medical needs of [a] prisoner[] constitutes the unnecessary and wanton infliction of pain . . . proscribed by the Eighth Amendment."[5] *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (quotations and citation omitted). But not every claim of inadequate medical treatment rises to the level of a constitutional violation. *McElligott v. Foley*, 182 F.3d 1248, 1254 (11th Cir. 1999); *see also Estelle*, 429 U.S. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."). "The inadvertent or negligent failure to provide adequate medical care 'cannot be said to constitute an unnecessary wanton infliction of pain.'" *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003) (quoting *Estelle*, 429 U.S. at 105–06).

---

[5] Because he was a pretrial detainee, Christmas's rights arose under the Due Process Clause of the Fourteenth Amendment rather than the Eighth Amendment. *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306 (11th Cir. 2009). The Court engages in the same analysis though.

To prove that inadequate medical care rose to the level of a constitutional violation under the Eighth or Fourteenth Amendments, a plaintiff must satisfy both an objective and a subjective inquiry. *Id.* A plaintiff must establish that he suffered from an "objectively serious medical need" and that the prison official acted with deliberate indifference to that need. *Id.* Defendants move for judgment as a matter of law, arguing that Christmas did not present sufficient evidence for the jury to reasonably conclude that Christmas suffered a serious medical need or that either defendant was deliberately indifferent to Christmas's medical needs. The Court disagrees. The evidence presented at trial was sufficient for a reasonable jury to find Defendants liable under the Fourteenth Amendment.

## A. Serious Medical Need

First, Christmas has presented evidence from which a reasonable jury could conclude that he suffered from a serious medical need. In the Eleventh Circuit, "a serious medical need is considered 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Melton v. Abston*, 841 F.3d 1207, 1221–22 (11th Cir. 2016) (quoting *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187 (11th Cir. 1994)). A medical need is serious if it poses "a substantial risk of serious harm" if left unattended. *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1303 (11th Cir. 2009) (quoting *Farrow*, 320 F.3d at 1243). Importantly for the present case, "[s]evere pain that is not

promptly or adequately treated can also constitute a serious medical need depending on the circumstances." *Melton*, 841 F.3d at 1222 (citing *McElligott*, 182 F.3d at 1255–59).

For example, in *McElligott*, a jail inmate who had complained for several months of severe stomach pains, sensitivity to touch, aches, an inability to eat, vomiting, and ineffectiveness of over-the-counter medication, brought a deliberate indifference claim against the jail's physician and a nurse. 182 F.3d at 1252–53. The constant complaints and troubling symptoms sufficed for a jury to conclude that the defendants knew of a substantial risk of harm to the plaintiff, despite the defendants not knowing that the plaintiff had cancer—a condition that was diagnosed only after his release. *Id.* at 1256.

Similarly, in *Melton*, an inmate suffered a broken arm. 841 F.3d at 1222. It was not unreasonable for the jury to conclude that his injury was "so obvious that even a lay person would easily recognize the necessity for a doctor's attention" where he presented testimony that his broken arm showed visible signs of damage. 841 F.3d at 1222 (quoting *Farrow*, 320 F.3d at 1243). The *Melton* plaintiff testified that the pain and intensity in his arm continued for months and he lost sensation in his broken hand over time, which was sufficient proof that the pain constituted a serious medical need. *Id.*

Here, Christmas presented evidence that he had at least one hernia and a colostomy that were both being considered for surgery when he was arrested. (Doc. 226 at 168, 170.) He testified and presented medical records corroborating the fact that he complained of

excruciating pain numerous times over eighteen months. *See* Table 1, *supra*. He testified that Dr. Rodriguez told him the body could take a lot of pain. (Doc. 226 at 190.) Further, he testified that the hernia visibly grew over the many months he complained of pain—an obvious complication resulting from a colostomy and deteriorating abdominal mesh that Drs. Rodriguez and Gomez knew about—and that he was in so much pain that he blacked out in front of Dr. Rodriguez. (Doc. 226 at 192–93, 210–21.) Construing the evidence in the light most favorable to Christmas, a reasonable jury could have concluded that Christmas suffered from a serious medical need so obvious that a lay person would recognize it—severe pain that presented a substantial risk of harm if left unattended, particularly given the underlying (and known) cause of the pain.

Defendants, claiming otherwise, argue that no doctor at the jail diagnosed his physical condition as requiring emergency or specialist attention, but this argument misunderstands the legal standard. (Doc. 231 at 16–20.) To be sure, one way to prove a serious medical need is by presenting evidence of a medical diagnosis; but another way is to submit evidence of a medical need "so obvious that even a lay person would easily recognize the necessity." *Hill*, 40 F.3d at 1187 (quotation omitted). Christmas testified that one hernia was visible and growing—the size of a golf ball—and that at one point he began expelling waste normally and not into his colostomy bag—the very thing a colostomy is intended to prevent. (Doc. 226 at 210–11.) In conjunction with the visible manifestations

of something having gone awry with the abdominal mesh and colostomy, he directly and repeatedly told the Defendants about his severe pain. And he filed 27 health services requests detailing his pain. These facts present a markedly different situation than the string cite of cases Defendants rely upon for support that no deliberate indifference claim lies when a physician provides some other treatment to a reducible hernia. (Doc. 231 at 19.) Drs. Rodriguez and Gomez even testified that hernias caused by weakening of abdominal mesh, like Christmas's, are not reducible absent surgery. (Doc. 226 at 253–54; Doc. 227 at 69.) A reasonable jury could conclude from his testimony that his medical need was obvious to even a lay person and that it presented a substantial risk of harm if left unattended.

Indeed, many cases arise in a posture like this one where the severe pain is reflective of an underlying medical condition that poses the risk of serious harm. In *McElligott*, the severe abdominal pain was a sign of cancer. 182 F.3d at 1252–53. In *Farrow*, severe oral pain was indicative of the plaintiff's need for dentures. 320 F.3d at 1243–44 ("In certain circumstances, the need for dental care combined with the effects of not receiving it may give rise to a sufficiently serious medical need to show objectively a substantial risk of serious harm."). These cases are clear: where a prisoner suffers from severe pain in a context that gives rise to an inference of an underlying problem[6] and complains about it for months,

---

[6] The Court summarizes this rule based on the Eleventh Circuit's caselaw but notes it would seemingly not apply in a context where allegations of pain represent an unreasonable complaint by a prisoner (such

there is sufficient evidence for a jury to conclude that he suffered from a serious medical need that posed a substantial risk of serious harm.

## B. Deliberate Indifference

Not only has Christmas presented sufficient evidence of an objectively serious medical need, he also has presented evidence sufficient for a reasonable jury to conclude that the Defendants were deliberately indifferent to that serious medical need. Christmas makes deliberate indifference claims against Dr. Rodriguez in his individual capacity and against Dr. Gomez in both her individual capacity and her supervisory capacity. He clears the bar as to all three theories of liability.

Under an individual capacity theory of liability, "[a] plaintiff claiming deliberate indifference to a serious medical need must prove: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." *Melton*, 841 F.3d at 1223. Conduct that rises to the level of deliberate indifference may be "(1) grossly inadequate care; (2) a decision to take an easier but less efficacious course of treatment; and (3) medical care that is so cursory as to amount to no treatment." *Id.* (citing *Bingham v. Thomas*, 654 F.3d 1171, 1176 (11th Cir. 2011)). Further, a defendant may be

as a hypochondriac complaining at length of unbearable pain due to a paper cut or something of similar exaggeration). Of course, Christmas's claims resemble nothing of the sort and thus this Court is not confronted with that scenario. Nor would an ordinary lay person conclude that kind of hypothetical warrants medical attention. *See Hill*, 40 F.3d at 1187–88 (summarizing that constitutional violations occur when medical needs 'involve life-threatening conditions or situations where it is apparent that delay would detrimentally exacerbate the medical problem" but not for "delay or even denial of medical treatment for superficial, nonserious physical conditions").

liable if he or she unreasonably refuses to treat an inmate's need for medical care or delays necessary treatment without explanation or for non-medical reasons. *Id.* Stated otherwise, although mere negligence will not suffice to support an Eighth Amendment claim, "prison officials with knowledge of the need for care may not, by failing to provide care, delaying care, or providing grossly inadequate care, cause a prisoner to needlessly suffer the pain resulting from his or her illness." *Estrada v. Stewart*, 703 F. App'x 755, 759 (11th Cir. 2017) (quoting *McElligott*, 182 F.3d at 1257). "In considering a deliberate indifference claim, '[e]ach individual Defendant must be judged separately and on the basis of what that persons knows.'" *Melton*, 841 F.3d at 1224 (quoting *Burnette v. Taylor*, 533 F.3d 1325, 1331 (11th Cir. 2008)).

Under a supervisory theory of liability, a plaintiff must present evidence that the supervisor "personally participate[d] in the alleged constitutional violation" or of a "causal connection between the actions of the supervising official and the alleged deprivation." *Mathews v. Crosby*, 480 F.3d 1265, 1270 (11th Cir. 2007) (quoting *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003)). "A causal connection may be established when: (1) a 'history of widespread abuse' puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he or she fails to do so; (2) a supervisor's custom or policy results in deliberate indifference to constitutional rights; or (3) facts support an inference that the supervisor directed subordinates to act unlawfully or knew that subordinates would

act unlawfully and failed to stop them from doing so." *Id.* (quoting *Cottone*, 326 F.3d at 1360). At trial, Christmas conceded that there was not enough evidence to support findings of a history of widespread abuse, that Dr. Gomez directed Dr. Rodriguez to take action that resulted in the alleged violation, or that Dr. Gomez knew that Dr. Rodriguez would take actions in violation of Christmas's rights and failed to stop him. The Court therefore never instructed the jury on these alternative theories of supervisory liability. Instead, Christmas proceeded solely on the theories that Dr. Gomez either personally participated in the constitutional violation or her policy or custom resulted in a deprivation of his constitutional rights.

### 1.  Dr. Rodriguez

Christmas presented sufficient evidence for a reasonable jury to conclude that Dr. Rodriguez was deliberately indifferent to his severe pain. Christmas presented Dr. Rodriguez's patient report from his May 2016 evaluation of Christmas, in which he noted that Christmas had a colostomy and a ventral hernia. (Doc. 218-1 at 24; Doc. 226 at 252–53.) Christmas testified that he personally complained of severe abdominal pain to Dr. Rodriguez on many occasions after this initial visit and that in response, Dr. Rodriguez gave him only Tylenol and told him that the body could take a lot of pain. Further, Christmas recounted an incident in which he blacked out in Dr. Rodriguez's office, Dr. Rodriguez revived him, and Dr. Rodriguez just sent him back to his dorm for rest. (Doc.

226 at 212–23.) A reasonable jury could conclude from this evidence that Dr. Rodriguez had a subjective knowledge that Christmas's pain posed a substantial risk of serious harm and that he disregarded that risk by conduct that is more than mere negligence through administering only Tylenol on occasion. *See McElligott*, 182 F.3d at 1257 ("Insofar as Elmore's pain was concerned, a jury could find that the medication provided to Elmore was so cursory as to amount to no care at all. A jury could conclude that, despite being aware that the medication prescribed for Elmore was not treating the severe pain he was experiencing, Dr. Foley and Wagner did nothing to treat Elmore's pain or respond to the deterioration of his condition."). The Court therefore denies Dr. Rodriguez's Rule 50(b) motion.

Defendants argue that Christmas cannot succeed on his claims because he received a medical diagnosis and care in the form of Tylenol and prescriptions for mental health medications. (Doc. 231.) But a jury is free to conclude that this treatment was "so cursory as to amount to no treatment" at all, especially in the light of Christmas's testimony regarding worsening symptoms, his surgical history of abdominal mesh and a temporary colostomy, his numerous medical requests for more pain medicine and attention to his colostomy and hernia-related problems, and the many times he was denied even Tylenol due to policies that seemed aimed at dissuading an inmate from repeatedly asking for medication. *See Melton*, 841 F.3d at 1225–26 (concluding a reasonable jury could find a

doctor was deliberately indifferent where the doctor delayed meeting with inmate with broken arm for months and even then only prescribed Ibuprofen, Tramadol, and Darvocet for his severe pain); *see also Farrow*, 320 F.3d at 1246–47 ("substantial and inordinate delay in treatment" raised a jury question as to deliberate indifference toward prisoner's medical need); *see also Estrada*, 703 F. App'x at 760 (holding that the plaintiff stated a plausible Eighth Amendment claim against medical providers and a prison administrator who knew the extent of his plan, "knew that the course of treatment was largely ineffective," and took no action to improve the plaintiff's condition for a prolonged period of time (quoting *McElligott*, 182 F.2d at 1257)).

Defendants further argue that Dr. Rodriguez was acting in his medical judgment by not referring Christmas to a specialist to evaluate his conditions. But this contention misunderstands two things. First, caselaw does not support a principle of absolute immunity for any decision made by a medical professional while treating patients. That rule would absolve physicians and nurses from all liability under the Eighth Amendment so long as the provider prefaced his actions with a declaration that it was in his "medical judgment" to do so. Governing precedent does not comport with that theory. *See McElligott*, 182 F.3d at 1259 (rejecting argument that Eighth Amendment precludes liability where defendant provided medical care to plaintiff because "the course of a physician's treatment" can "manifest the physician's deliberate indifference to the inmate's

medical needs" (quoting *Waldrop v. Evans*, 871 F.2d 1030, 1035 (11th Cir. 1989))). Indeed, the Eleventh Circuit constitutionally faults a provider when he or she "fail[s] to provide care, delay[s] care, or provid[es] grossly inadequate care." *Estrada*, 703 F. App'x at 760 (quoting *McElligott*, 182 F.3d at 1257). A difference of medical opinion on a course of treatment is distinct from a decision made by a medical provider that amounts to minimal or cursory treatment. *See Melton*, 841 F.3d at 1223 ("In our decisions, conduct deliberately indifferent to serious medical needs has included: (1) grossly inadequate care; (2) a decision to take an easier but less efficacious course of treatment; and (3) medical care that is so cursory as to amount to no treatment at all."). For instance, it is clear that prisoners have a right to timely treatment if presenting a serious medical need, meaning a medical professional's decision willfully to defer treatment is not immune from liability. *See McElligott*, 182 F.3d at 1257–59 (finding jury question existed as to whether medical staff was deliberately indifferent to medical need for further diagnosis and treatment of severe pain where prisoner was given diet changes and Tylenol but staff continued not to pursue further tests); *Farrow*, 320 F.3d at 1247 ("'[D]elayed treatment for injuries that are of a lesser degree . . . may also give rise to constitutional claims.'" (quoting *Harris v. Coweta Cnty.*, 21 F.3d 388, 294 (11th Cir. 1994))).

Second, while Defendants attempt to recast this case as one in which an inmate requested specialized treatment from an outside physician while Defendants disagreed with

that request in their "medical judgment," (Doc. 231 at 17), they fail to acknowledge that Christmas's claim is not merely that he was not referred for specialized treatment. Christmas testified that he was in severe pain for months, that he complained about it and sought help on a frequent basis, and that Dr. Rodriguez intentionally withheld treatment that might have alleviated his pain—including prescription or more efficacious pain medication, regular colostomy and hernia maintenance, and, yes ultimately, referral to an outside physician—despite knowing that his condition posed a substantial risk of serious harm if left unchecked. Christmas was not seeking specialized treatment like laser eye surgery or orthopedic surgery for a small cyst; he was seeking *any* treatment for the "excruciating" pain that persisted over eighteen months. *Contra Hilton v. McHugh*, 178 F. App'x 866, 870–71 (11th Cir. 2006) (concluding that nurse practitioner was not deliberately indifferent to inmate's serious medical condition despite claim that an orthopedic specialist removed a golf-ball sized cyst from elbow where plaintiff was prescribed substantial pain medication and provided two elbow braces); *Tucker v. Busbee*, 619 F. App'x 868, 871 (11th Cir. 2015) (affirming dismissal of complaint that alleged doctor should have compelled prison officials to send inmate suffering from diabetic retinopathy to a laser eye surgeon for specialized treatment when inmate continued to receive medical care for his diabetes). Contrary to Defendants' contention, Christmas's claim is not foreclosed as a matter of law.

2.  Dr. Gomez

Additionally, Christmas presented sufficient evidence for a reasonable jury to conclude that Dr. Gomez was liable in her individual and supervisory capacity. While there is admittedly less evidence to support a finding of liability for Dr. Gomez, the Court is cognizant that it is the jury's role to weigh credibility and to find facts, and the Court is obliged at this point to view all evidence in the light most favorable to Christmas. The Court will not undo the jury's verdict simply because it might have weighed the evidence differently had it been the factfinder—that would be unlawful. And because Christmas presented sufficient evidence to preclude judgment as a matter of law for Dr. Gomez, the Court denies her motion under Rule 50(b).

a.  *Individual Liability*

First, Christmas presented sufficient evidence for a reasonable jury to conclude that Dr. Gomez had a subjective knowledge of Christmas's pain and disregarded that risk by conduct that is more than mere negligence. Christmas testified that he saw Dr. Gomez multiple times and complained to her about the immense pain that he was experiencing. (Doc. 226 at 231–32.) Despite Dr. Gomez's testimony that she never treated him, Christmas provided treatment orders that were made "per Gomez" and prescriptions for Christmas in her name. (Doc. 218-3 at 34–40, 119, 121, 125, 131, 145, 147, 149, 151.) He also presented an affidavit by Dr. Gomez stating, "At times Mr. Christmas has

complained of pain, those complaints were addressed by providing prescription strength and over-the-counter pain medications. . . .  If at any time I thought Mr. Christmas needed additional care or specialty consultation, I would have entered those orders." (Doc. 227 at 74–76.) Further, Dr. Gomez had "final responsibility for making or approving all medical decisions regarding the care provided to inmates in the Polk County Jail." (Doc. 227 at 55, 57; Doc. 218-13 at 17.) Dr. Rodriguez testified that he was in constant communication with Dr. Gomez and consulted with her on non-emergent treatment. (Doc. 226 at 240.) These pieces of evidence, taken together, permit a reasonable jury to draw the inference that Dr. Gomez was personally involved in Christmas's treatment, knew of the pain he was experiencing, and intentionally decided not to provide further treatment beyond the Tylenol prescribed. To be sure, subjective knowledge almost always must be proven through circumstantial evidence. *See Farmer v. Brennan*, 511 U.S. 825, 843 (1994) ("Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." (internal citations omitted)).

Compare these facts to those in *Melton*. In *Melton*, the Eleventh Circuit reversed a grant of summary judgment in favor of a sheriff who was informed of the plaintiff's broken arm only by secondhand reports from the detainee's family members and inmate

request forms. 841 F.3d at 1229–30. This evidence, coupled with an affidavit from the sheriff that "instructed [his] staff to provide all necessary medical care to Mr. Melton," was sufficient to create a triable issue of fact of the sheriff's subjective knowledge of the inmate's serious medical need. *Id.* The court further concluded that evidence that the sheriff failed to authorize x-rays and did not permit consultation with an orthopedic surgeon created a triable issue of fact as to whether the sheriff deliberately denied medical treatment to the inmate. *Id.*

The *Melton* facts are not so different from Dr. Gomez's situation; there is perhaps more evidence here in Christmas's favor. He testified that he told her directly about his pain, he presented evidence that she ordered him prescriptions, and her own affidavit asserted that she would have provided further medical treatment if she deemed it necessary—all evidence from which a jury could infer she was aware of his condition and involved, at least in some way, with his treatment or lack thereof. Because "'[c]hoosing to deliberately disregard' an inmate's complaints of pain 'without any investigation or inquiry,'" constitutes deliberate indifference, *Taylor v. Hughes*, 920 F.3d 729, 734 (11th Cir. 2019) (quoting *Goebert v. Lee Cnty.*, 510 F.3d 1312, 1328 (11th Cir. 2007)), a reasonable jury may conclude that Dr. Gomez made a decision not to investigate the cause of Christmas's repeated complaints of pain, which showed a deliberate disregard for the substantial risk of harm to him.

b. *Supervisory Liability*

Christmas has also presented sufficient evidence for a reasonable jury to conclude that Dr. Gomez was liable for Dr. Rodriguez's deliberate indifference in her supervisory capacity, specifically that she personally participated in the constitutional violation or that her policy or custom resulted in a deprivation of Christmas's Fourteenth Amendment right.

As explained above, a jury may infer from the evidence presented that Dr. Gomez personally participated in the violations of Christmas's rights.[7] Her name appeared on orders and prescriptions, indicating a personal hand in his treatment decisions. Dr. Rodriguez testified of daily phone calls and consultation with Dr. Gomez regarding patient treatment, particularly non-emergent treatment. (Doc. 226 at 238–40.) Further, to the extent Christmas might have been referred to an outside specialist earlier, Dr. Gomez would have had to approve that request from Dr. Rodriguez. (Doc. 226 at 239, 244.) And Dr. Gomez's own affidavit permits a natural inference of her oversight over Christmas's treatment. While Dr. Gomez had a different view of her role—that it was "just a title" and she did not really supervise Dr. Rodriguez—a jury may choose not to credit her testimony

---

[7] It is not entirely clear from caselaw how "personally participated in the violation" is so distinct from an individual theory of liability. To the extent there is daylight between the two theories, it is the difference between personally violating the claimant's constitutional rights and participating in *another actor's* violation of the claimant's rights. For example, here it would be the difference between Dr. Gomez personally giving constitutionally inadequate treatment herself, i.e., by prescribing inadequate mediation or directing cursory treatment, compared to Dr. Gomez participating in Dr. Rodriguez's constitutionally inadequate treatment, i.e., consulting on treatment plans over the phone.

and instead to give weight to Dr. Rodriguez's understanding of their relationship and certainly her title and role of "medical director." (Doc. 227 at 56–58.)

Further, there was sufficient evidence for the jury to conclude that Dr. Gomez's policy or policies resulted in the denial of Christmas's rights. Christmas testified that he was told many times that the medical providers at Polk County Jail did not treat chronic pain. (Doc. 226 at 186, 189.) Indeed, this testimony was corroborated by a written response Christmas received to an inmate grievance form signed by a medical provider: "As I am sure that my medical staff has told you before, we do not treat chronic pain." (Doc. 218-12 at 4; Doc. 226 at 218–19.) Christmas also testified that he was told that the jail did not pay for non-emergent surgeries, and a nurse's report admitted into evidence confirmed that this policy was conveyed to Christmas. (Doc. 218-1 at 31 ("[Inmate] education: Surgery and need for surgery. [Inmate] instructed that county will not pay for non-emergent surgeries."); Doc. 226 at 193.)

Christmas also presented evidence from which a reasonable jury could conclude that these policies were attributable to Gomez and implemented by her. Dr. Gomez served as the medical site director and approved the policies implemented at the jail. (Doc. 227 at 52–53.) For example, Dr. Gomez testified that she signed the yearly protocols that gave the nurses authorization to give certain over-the-counter medications. (Doc. 227 at 72.) Christmas testified that his understanding—from observing the nurses and the

explanations given when they refused treatment—was that Dr. Gomez was in charge and nurses required her approval to provide the treatment he sought. (Doc. 226 at 200-02.) Dr. Gomez herself even introduced this evidence of her supervisory role in implementing the jail's policies. (Doc. 227 at 80–81 (discussing how the nursing protocol worked and her role in approving them).) And the nurses informed Christmas that non-emergent surgeries would not be treated as a *matter of protocol*. (Doc. 218-1 at 31 ("[Inmate] education: Surgery and need for surgery. [Inmate] instructed that county will not pay for non-emergent surgeries."); Doc. 218-12 at 4; Doc. 226 at 218–19 ("As I am sure that my medical staff has told you before, we do not treat chronic pain.").) Christmas also presented many nurses' orders for Prilosec, Effexor, and Tylenol that were made "per Gomez," in other words, per her approved policies as medical director of the Polk County Jail. (Doc. 218-3 at 34–40.) From this evidence, a jury could reasonably infer that Dr. Gomez implemented a policy of either non-treatment of chronic pain with medications more efficacious than Tylenol or one for not paying for non-emergent surgeries and that either policy resulted in Dr. Rodriguez not treating Christmas's severe pain and worsening hernia and colostomy problems. *See Franklin v. Tatum*, 627 F. App'x 761, 766–67 (11th Cir. 2015) (finding a genuine issue of material fact as to whether a custom resulted in sexual assault of female pretrial detainees where evidence was presented that sheriff had no policy regarding housing of female inmates and did not enforce cross-gender transport policy).

The jury heard evidence that these policies (or protocols) governed medical treatment, that they curtailed Christmas's treatment on many occasions, and that Dr. Gomez implemented the medical policies at the Polk County Jail. These facts allow an inference that the "affirmative custom or policy implemented by the supervisory defendant[] played a role in [Christmas's serious medical need]." *Cottone*, 326 F.3d at 1362.

Importantly, this case is not like those in which a plaintiff merely shows one instance of an unconstitutional act in support of the assertion that a policy resulting in constitutional violations exists. *See, e.g.*, *Piazza v. Jefferson Cnty.*, 923 F.3d 947, 957–58 (11th Cir. 2019) (finding allegations that officers were indifferent to an inmate's medical needs, without alleging any facts concerning the policies or customs that led to alleged violations, insufficient to state a supervisory liability claim); *Craig v. Floyd Cnty.*, 643 F.3d 1306, 1312 (11th Cir. 2011) (affirming grant of summary judgment where plaintiff's "only proof of [the] alleged policy or custom [was] that nine medical providers evaluated him sixteen times over nine days before referring him to a physician"). To be sure, in those cases "[a] single incident of a constitutional violation is insufficient to prove a policy or custom even when the incident involves several [subordinates.]" *Id.* at 1311 (second alteration in original). But here, Christmas testified he was told about these policies in response to his requests and he introduced specific evidence of these policies in the form of a nurse's report and a response to his grievance that, on their face, state the policies exist. *Cf. Piazza*, 923

F.3d at 958 ("Because [plaintiff's] complaint contains only conclusory assertions that jail officers were indifferent to [inmate's] needs pursuant to certain policies or customs— without alleging any facts concerning those policies or customs . . . —he has not stated a claim for supervisory liability for deliberate indifference to serious medical needs."). This evidence of policies, along with his testimony that he was repeatedly informed from medical providers at the jail that these policies prevented providing him additional aid, along with evidence that Dr. Gomez was the one responsible for implementing policies at the jail is enough for a reasonable jury to infer a causal connection establishing Dr. Gomez's supervisory liability.

## V.   MOTION FOR A NEW TRIAL

Defendants also move for a new trial because they claim that (1) the trial evidence greatly weighed in their favor and (2) the Court erred in allowing an amendment to include a supervisory claim against Dr. Gomez. For the same reasons that Defendants' motion for judgment as a matter of law was unsuccessful, Defendants' argument that the greater weight of evidence was in their favor is not persuasive. "A new trial should not be granted on evidentiary grounds unless, at a minimum, the verdict is against the *great*—not merely the greater—weight of the evidence." *United States v. Sullivan*, 1 F.3d 1191, 1196 (11th Cir. 1993) (emphasis added). Thus, it is not enough that the evidence weighs more in favor of the moving party, the evidence must be overwhelming. In a case like this one, where

questions of credibility rule the day, the Court cannot say that the great weight of evidence is in favor of Defendants.

Similarly, Defendants' contention that the Court erred by granting Christmas's motion to conform the pleadings to the evidence presented and instruct the jury as to supervisory liability for Dr. Gomez is not persuasive. Under Rule 15(b)(1), a court may allow amendment of the pleadings at trial if "doing so will aid in presenting the merits and the objecting party fails to satisfy the court that the evidence would prejudice that party's action or defense on the merits." Defendants presented no such prejudice to their defense prior to trial, during trial, or even now in their motion for a new trial.

By Defendants' account, they first became aware of Christmas's intent to pursue a supervisory liability claim against Dr. Gomez via the pretrial statement and Christmas's request for a jury instruction on the issue. That is odd, since the parties are required to confer and to file a *joint* pretrial statement. In fact, counsel for Defendants signed the joint pretrial statement (Doc. 173), so he would have known of the potential theory of supervisory liability *prior* to the filing of that statement. As such, Defendants had roughly three weeks' notice prior to trial. Despite the intervening time to contemplate the issue and exhaustive discussion of the issue at the pretrial conference, the beginning of trial, and the charge conference, defense counsel never articulated prejudice to Dr. Gomez beyond the ubiquitous desire to not litigate an unpled claim. (Doc. 227 at 124 ("Bringing separate

claims on the eve of trial after everything is closed is obviously, in my mind, prejudicial. That's all I can say.").) Even now, Defendants' motion only has this to offer as prejudice: "A week before trial, a new claim was raised. Discovery was long-over. Trial was on the immediate horizon. Introducing a new claim at that point was clear prejudice." (Doc. 233 at 16.) In fact, when discussing the Rule 15(b)(1) motion near the close of trial, the Court pressed defense counsel to articulate how Dr. Gomez was prejudiced, namely, what evidence would he have sought in discovery or objected to or how would he have in any way litigated the case differently. (Doc. 227 at 119 ("But what's the actual prejudice besides late notice?").) Counsel offered none. Instead, he returned to his argument that there was no evidence of supervisory liability. (*Id.*)

Worse yet, despite explicit instructions from the Court to object to individual pieces of evidence that were not relevant to a properly pleaded supervisory claim, *see* (Doc. 226 at 33 ("But I do need you to object when it's individual pieces of evidence that you think are inadmissible because they're going to that theory of liability.")), defense counsel raised no objections of the kind. This is perhaps because evidence that would be relevant for supervisory liability would also be relevant to the individual liability claims. And, ironically, it was defense counsel who introduced evidence of Dr. Gomez's supervisory role through her testimony regarding implementation of Corizon policies, audits of the Polk County jail, and signing off on nursing protocol. (Doc. 227 at 76–82.) Allowing evidence that could

prove multiple claims comports with the purpose of Rule 15(b) "to promote the objective of deciding cases on their merits rather than in terms of the relative pleading skills of counsel," a purpose especially present in the case of a pro se pleading. Charles A. Wright & Arthur R. Miller, 6A Fed. Prac. & Proc. Civ. § 1491 (3d ed. 2021); *cf. Tannebaum v. United States*, 148 F.3d 1262, 1263 (11th Cir. 1998) ("Pro se pleadings are held to a less stringent standard than pleading drafted by attorneys and will, therefore, be liberally construed.").

This reality also undercuts Defendants' claims of prejudice. Defendants never pointed to any evidence that was improperly admitted nor how they might have rebutted that evidence if given further opportunities to prepare. "Prejudice turns on whether the defendant had a fair opportunity to defend and whether the defendant could offer any additional evidence if the case were to be retried on a different theory." *Doe #6 v. Miami-Dade Cnty.*, 974 F.3d 1333, 1340 (11th Cir. 2020) (quotations and alterations omitted). At bottom, Dr. Gomez never articulated how she would have litigated the case differently if she had more time to prepare for the supervisory liability claim. Accordingly, the motion for new trial is denied.

## VI.   CONCLUSION

For the foregoing reasons, Defendants' Motion for Judgment as a Matter of Law (Doc. 231) and Motion for a New Trial (233) are **DENIED**.

**ORDERED** in Tampa, Florida, on September 3, 2021.

Kathryn Kimball Mizelle
United States District Judge